RACHEL WATERS,          )
                           )
        Plaintiff,        )
                           )
     vs.                )        Case No. 1:07CV100 LMB
                           )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,  )
                           )
        Defendant.     )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Rachel Waters for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 18).

## Procedural History

On March 22, 2005, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on September 30, 2001. (Tr. 51-53). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated April 5, 2005. (Tr. 18, 32-36, 8-17). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on May 17, 2007. (Tr. 7, 3-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on September 22, 2006. (Tr. 298). Plaintiff was present and was represented by counsel. (Id.). The ALJ began the hearing by summarizing plaintiff's case. (Id.). The ALJ stated that plaintiff alleged in her application for benefits that she became disabled on September 30, 2001, due to arthritis; severe pain in her legs and hips; symptoms of peripheral vascular disease;[1] high blood pressure; and a slow thyroid. (Id.). The ALJ noted that plaintiff was receiving Supplemental Security Income (SSI) benefits at the time of the hearing. (Id.). Plaintiff testified that she had been receiving SSI benefits for about two years. (Tr. 299). Plaintiff's attorney indicated that plaintiff applied for SSI along with her current application for Disability Insurance Benefits and she was awarded SSI but denied Disability Insurance Benefits due to the expiration of her insured status. (Id.).

The ALJ then admitted all of the exhibits into the record. (Tr. 300). Plaintiff's attorney indicated that she still had not received some medical records that she had requested. (Tr. 301). Plaintiff's attorney requested that the ALJ leave the record open for ten days. (Id.). The ALJ granted plaintiff's attorney's request. (Tr. 302).

Plaintiff's attorney then examined plaintiff, who testified that she was 62 years of age.

---

[1]Any disease or disorder of the circulatory system outside of the brain and heart. See Stedman's Medical Dictionary, 1463 (28th Ed. 2006).

(Tr. 304). Plaintiff stated that she attended school until half-way through fifth grade. (Id.). Plaintiff testified that she was twelve or thirteen years of age at this time. (Id.). Plaintiff stated that she never returned to school. (Id.). Plaintiff testified that she entered the workforce after leaving school. (Id.). Plaintiff stated that she worked on the family farm. (Id.).

Plaintiff testified that she completely quit working when she was 59 years of age. (Tr. 305). Plaintiff stated that she had a job from the time she was 13 until she was 59. (Id.). Plaintiff testified that at some points during this time period, she had more than one job. (Id.).

Plaintiff stated that she worked as a housekeeper at a hospital, a cook at a bowling alley, a waitress, and then worked at a donut shop for 23 years. (Id.). Plaintiff testified that at the donut shop, she worked at the register, cleaned, and did anything else that was required. (Id.). Plaintiff stated that all of her past jobs required her to be on her feet all day. (Id.). Plaintiff testified that she never had a job prior to the "junk store" that allowed her to sit while working. (Id.). Plaintiff stated that some of her jobs required lifting and carrying heavy items. (Tr. 306).

Plaintiff testified that she was required to lift the least amount of weight at her job at the hospital, Missouri Delta Medical Center. (Id.). Plaintiff stated that the heaviest items she lifted at the hospital were mop buckets filled with water. (Id.). Plaintiff testified that she worked at Missouri Delta Medical Center for a year-and-a-half. (Id.). Plaintiff testified that she had two other jobs when she worked at the hospital. (Id.).

Plaintiff testified that her last job was owner and operator of a junk store. (Id.). Plaintiff stated that she opened the junk store to have something to do and because she had always wanted to own a business. (Tr. 307).

Plaintiff testified that she worked as a salesperson for L.B. Price prior to owning her own

business.  (Id.).  Plaintiff stated that when she worked as a salesperson, she delivered household goods.  (Id.).  Plaintiff testified that this position involved standing on her feet a significant amount of time.  (Id.).  Plaintiff stated that the position also required lifting boxes that weighed 40 to 60 pounds.  (Id.).

Plaintiff testified that her junk store business did not do well financially.  (Tr. 308). Plaintiff stated that the business never really made a profit.  (Id.).

Plaintiff testified that she left the workforce in 2001 because she experienced leg and back pain that prevented her from working.  (Tr. 309).  Plaintiff stated that she sold the junk store in 2001.  (Id.).  Plaintiff testified that she was under the care of Dr. Robert L. Robbins when she stopped working.  (Id.).  Plaintiff stated that Dr. Robbins recommended that she see specialists at this time but she did not because she did not have insurance and did not have much income.  (Id.). Plaintiff testified that due to her financial situation, she received a very minimal amount of care for her physical complaints.  (Tr. 309-310).

Plaintiff stated that Dr. Robbins treated her for problems with her legs, feet, back, shoulders, and any other complaints she had.  (Tr. 310).  Plaintiff testified that she has arthritis, which continued to worsen.  (Id.).  Plaintiff stated that she had a torn rotator cuff in the 1990s. (Id.).  Plaintiff testified that Dr. Robbins treated her for complaints related to her torn rotator cuff in 2001.  (Id.).  Plaintiff stated that Dr. Robbins mostly just prescribed pain medication for her shoulder.  (Tr. 311).  Plaintiff testified that her shoulder pain is arthritic.  (Id.).  Plaintiff stated that she has good days and bad days with her arthritis.  (Id.).

Plaintiff testified that at the time of the hearing, she was under treatment for bulging discs, arthritis, hypertension, thyroid problems, and nerve problems.  (Id.).  Plaintiff stated that she had

all of these impairments in 2001 and she takes medication for them.  (Id.).  Plaintiff testified that she started taking an anti-depressant about a year prior to the hearing.  (Id.).

Plaintiff stated that she has been taking Diovan[2] for hypertension since the 1990s.  (Tr. 312).

Plaintiff testified that she takes Hydrochlorothiazide[3] for the swelling in her knees.  (Id.). Plaintiff stated that Dr. Robbins has been treating her for swelling in her knees due to fluid retention since 2001.  (Tr. 313).

Plaintiff testified that she has been taking Atenolol[4] for heart flutters for less than a year. (Id.).  Plaintiff stated that she has not seen a cardiologist.  (Id.).

Plaintiff testified that she has been taking Levoxyl[5] for her low thyroid condition for about two years.  (Tr. 314).  Plaintiff stated that this medication causes lethargy and weight gain.  (Id.).

Plaintiff testified that she takes Tramadol,[6] which is a pain medication.  (Id.).  Plaintiff stated that she does not take this medication as prescribed because it causes drowsiness.  (Id.). Plaintiff testified that she experiences pain in her hips, back, and down her left leg.  (Id.).  Plaintiff stated that her pain and complaints have worsened since she stopped working in 2001.  (Tr. 315). Plaintiff testified that she stopped working due to pain in her knees and legs that prevented her

---

[2]Diovan is indicated for the treatment of hypertension.  See Physician's Desk Reference (PDR), 2252 (57th Ed. 2003).

[3]Hydrochlorothiazide is indicated for the treatment of hypertension.  See PDR at 2523.

[4]Atenolol is indicated for the treatment of hypertension, angina pectoris, and acute myocardial infarction.  See PDR at 686.

[5]Levoxyl is indicated for the treatment of hypothyroid.  See PDR at 1806.

[6]Tramadol is indicated for the short-term management of acute pain.  See PDR at 2508-09.

from walking.  (Id.).

Plaintiff stated that she takes Piroxicam,[7] an anti-inflammatory drug, for the inflammation in her knees.  (Id.).  Plaintiff testified that she also takes a fluid pill if she feels like she is swollen.  (Id.).

Plaintiff testified that when she owned and operated the junk store, she bought furniture and appliances at auctions and loaded and unloaded heavy items herself, with her daughter's help.  (Tr. 317).  Plaintiff stated that the heavy lifting was painful.  (Id.).  Plaintiff testified that after she closed the store, she thought she would rest for a while and then re-enter the workforce.  (Id.).

Plaintiff stated that she becomes stiff when she stays still too long.  (Id.).  Plaintiff testified that she feels better when she moves around all the time.  (Id.).  Plaintiff stated that her grandchildren keep her busy.  (Id.).

Plaintiff testified that since 2001, she has not been able to sit long periods.  (Tr. 318).  Plaintiff stated that when she sits too long, her hip locks and her leg becomes stiff.  (Id.).

Plaintiff testified that she cannot stand for long periods due to hip, back, and leg pain.  (Tr. 319).  Plaintiff stated that she is unable to stand long enough to finish washing dishes due to the pain.  (Id.).

Plaintiff testified that she does not receive help with household chores.  (Id.).  Plaintiff stated that she lives with her granddaughter, who is seventeen.  (Id.).  Plaintiff testified that her granddaughter is lazy and sleeps all day.  (Tr. 320).

Plaintiff stated that she usually spends her days trying to complete housework and errands.  (Id.).  Plaintiff testified that she pays bills and shops for groceries in town.  (Id.).  Plaintiff stated

---

[7]Piroxicam is indicated for the treatment of osteoarthritis.  See PDR at 2599.

that she experiences difficulty completing these tasks.  (Id.).  Plaintiff testified that it takes her all day to accomplish tasks that used to take her only an hour-and-a-half to complete.  (Id.).  Plaintiff stated that she has to stop and take breaks due to pain.  (Id.).

Plaintiff testified that she was not in special classes when she left school in the fifth grade. (Id.).  Plaintiff stated that she can read and write.  (Id.).  Plaintiff testified that she is able to read a newspaper and understand its content.  (Id.).

The ALJ next explained to plaintiff that in order to be entitled to benefits, she must show that she had a disabling impairment prior to the expiration of her insured status on June 30, 2002. (Tr. 321).

The ALJ then examined plaintiff, who testified that she has not worked since June 30, 2002.  (Tr. 322).  Plaintiff stated that she was under the care of a doctor on a regular basis in June and July of 2002.  (Id.).  Plaintiff testified that she saw a doctor at least once a month during this time.  (Id.).  Plaintiff stated that she was being treated for high blood pressure and her aches and pains.  (Id.).  Plaintiff testified that Dr. Robbins imposed restrictions on her as of June or July of 2002.  (Id.).  Plaintiff stated that Dr. Robbins told her that she should not pick up kids because this would aggravate her impairments.  (Tr. 323).  Plaintiff testified that Dr. Robbins has diagnosed her with arthritis.  (Id.).

Plaintiff stated that as of June or July of 2002, she was unable to lift a big bag of flour or a big laundry basket of clothes.  (Id.).  Plaintiff testified that her doctor told her not to lift her granddaughter, who weighed about thirty pounds at the time.  (Tr. 324).  Plaintiff stated that her doctors recommended that she undergo surgery on her knees, although she underwent injections prior to surgery.  (Id.).  Plaintiff testified that she finished the injections in February of 2006.

(Id.).

Plaintiff stated that she was just treated with anti-inflammatory medication in 2002 because she did not have insurance. (Tr. 325). Plaintiff testified that she did not participate in physical therapy in 2002. (Id.). Plaintiff stated that her doctor recommended stretching exercises for her back, but they did not result in improvement. (Id.). Plaintiff testified that she took ibuprofen in 2002, which helped relieve her pain. (Tr. 326). Plaintiff stated that she took Celebrex[8] in 2002, but it made her sick. (Id.).

Plaintiff testified that she could not have performed any of her past work in 2002. (Id.). Plaintiff stated that she does not know if she could have performed any other work in 2002. (Id.). Plaintiff testified that she could have tried to perform other work, but she does not think she would have been able to successfully work. (Id.). Plaintiff stated that nothing happened on her alleged onset date of September 30, 2001, but rather, she just decided at that time that she was disabled. (Tr. 327).

Plaintiff testified that she is separated from her husband. (Id.). Plaintiff stated that she lives with her seventeen-year-old granddaughter. (Id.). Plaintiff testified that her granddaughter does not help her with household tasks. (Id.). Plaintiff stated that she lived with her husband in 2002. (Id.). Plaintiff testified that her husband did not help her with household chores. (Id.). Plaintiff stated that the housework was her responsibility and that she performed it as much as she could. (Tr. 328). Plaintiff testified that she was not able to lift anything heavy. (Id.).

Plaintiff stated that on a typical day in 2002, she spent the first few hours of the day trying to "get [her] body together." (Id.). Plaintiff testified that she would then try to do a little

---

[8]Celebrex is indicated for the treatment of osteoarthritis. See PDR at 2590.

housework at a time.  (Id.).  Plaintiff stated that she did not lie around much at that time.  (Id.).  Plaintiff testified that she never took naps.  (Id.).  Plaintiff stated that she alternated between standing and sitting down.  (Id.).  Plaintiff testified that she worked for a while and then sat down to take breaks.  (Id.).  Plaintiff stated that she watched television or read during her breaks from household chores.  (Tr. 329).

Plaintiff testified that she did not participate in any groups outside the home in 2002.  (Id.).  Plaintiff stated that she and her husband did not visit with family.  (Id.).  Plaintiff testified that she did not participate in any activities outside the home in 2002.  (Id.).  Plaintiff stated that she has not sought employment at any time since September of 2001.  (Id.).  Plaintiff testified that since September 2001, she has been unable to perform any work.  (Id.).

Plaintiff stated that she has not been hospitalized since September 30, 2001.  (Tr. 330).  Plaintiff testified that she has only been to the hospital for tests.  (Id.).  Plaintiff stated that she has never undergone surgery.  (Id.).  Plaintiff testified that she has never broken any bones.  (Id.).

Plaintiff stated that she was experiencing significant pain during the hearing.  (Id.).  Plaintiff rated her pain as an 85 on a scale of 1 to 100 during the hearing.  (Id.).  Plaintiff testified that the amount of pain she was experiencing during the hearing was about average for her.  (Id.).  Plaintiff stated that if she were at home, she would sit down for a few minutes on her couch to try to relieve her pain.  (Tr. 331).

Plaintiff testified that in 2002, her pain level varied.  (Id.).  Plaintiff stated that on some days in 2002, she would rate her pain as a 100, and on other days, it was much less.  (Id.).  Plaintiff testified that her pain was worse at the time of the hearing than it was in 2002.  (Id.).

When asked by the ALJ if there was anything else she would like to add, plaintiff stated

that she is unable to work due to her pain.  (Tr. 332).

Plaintiff's attorney then re-examined plaintiff, who testified that Dr. Robbins recommended physical therapy in 2002, but she was unable to attend due to financial problems. (Id.).  Plaintiff stated that she did not have health insurance at that time.  (Id.).

The ALJ then questioned plaintiff, who testified that she did not try to obtain Medicaid benefits until July of 2006.  (Id.).  Plaintiff stated that she did not try to obtain Medicaid benefits prior to this time because she did not want to seek help and she thought she could go back to work.  (Id.).  Plaintiff testified that she did not apply for Medicaid benefits because she did not think she qualified for Medicaid.  (Tr. 333).

The ALJ then concluded the hearing.  (Id.).  He indicated that he would leave the record open for ten days for supplementation.  (Id.).

**B.      <u>Relevant Medical Records</u>**

Plaintiff presented to Robert L. Robbins, D.O., complaining of weight problems and hot flashes on September 3, 1998.  (Tr. 263).  Dr. Robbins diagnosed plaintiff with obesity.  (Id.). Dr. Robbins prescribed medications for hot flashes and weight loss, and recommended exercise and food management.  (Id.).  Plaintiff saw Dr. Robbins for a follow-up regarding her weight problems on October 8, 1998.  (Tr. 262).  Plaintiff missed a scheduled appointment with Dr. Robbins on November 6, 1998.  (Id.).

Plaintiff saw Dr. Robbins on January 27, 2000, at which time she complained of pain in her weight-bearing joints, chronic sinusitis, weight gain, and absence of a menstrual period for a year.  (Tr. 261).  Dr. Robbins noted that plaintiff's pain in the weight-bearing joints was due in part to her weight problems.  (Id.).  Plaintiff's examination was otherwise unremarkable.  (Id.).

Dr. Robbins' assessment was arthralgia[9] secondary to probable degenerative osteoarthritis;[10] and obesity. (Id.). Dr. Robbins prescribed Celebrex for plaintiff's joint pain and recommended diet and an exercise program. (Id.). On February 7, 2000, plaintiff reported some relief with the Celebrex. (Id.). Dr. Robbins' impression was degenerative osteoarthritis. (Id.).

Plaintiff missed a scheduled appointment with Dr. Robbins on February 25, 2000. (Tr. 260).

Plaintiff saw Dr. Robbins on April 4, 2000, for a follow-up regarding her weight loss efforts. (Tr. 259). Dr. Robbins' impression was weight loss with medication. (Id.). Dr. Robbins refilled plaintiff's prescription for weight-loss medication and encouraged her to watch what she eats. (Id.).

Plaintiff missed a scheduled appointment with Dr. Robbins on May 3, 2000. (Id.). On May 9, 2000, plaintiff had lost five pounds and it was noted that plaintiff was making significant improvement. (Id.). Plaintiff's physical examination was unremarkable. (Id.). Dr. Robbins' assessment was weight loss with medication. (Id.).

Plaintiff missed scheduled appointments with Dr. Robbins on May 30, 2000 and June 9, 2000. (Tr. 258). On June 14, 2000, plaintiff presented to Dr. Robbins complaining of a spider bite. (Id.). Dr. Robbins noted that plaintiff was doing great with her weight control. (Id.).

On June 14, 2000, plaintiff presented for weight-loss medication refills. (Tr. 257). Dr.

_____

[9]Pain in a joint. See Stedman's at 159.

[10]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

Robbins noted that plaintiff's physical examination was unremarkable and that she was continuing to lose weight slowly. (Id.).

On July 17, 2000, plaintiff complained of hot flashes. (Id.). Dr. Robbins' assessment was weight loss with medication and estrogen deficiency. (Id.). He prescribed medication for plaintiff's hot flashes. (Id.). Plaintiff presented for a follow-up regarding her estrogen deficiency on July 24, 2000. (Tr. 256).

On August 17, 2000, plaintiff presented for follow-up regarding her weight control and estrogen deficiency. (Id.). Plaintiff reported vaginal bleeding from a new medication. (Id.). Dr. Robbins' referred plaintiff to Dr. Joe Jacobs and refilled her weight loss medication. (Id.).

Plaintiff missed scheduled appointments with Dr. Robbins on August 24, 2000 and August 29, 2000. (Id.). On September 18, 2000, plaintiff presented to Dr. Robbins for a follow-up regarding her weight control and estrogen deficiency. (Tr. 255). Plaintiff reported that she did not make her appointment to see Dr. Jacobs because she could not afford it. (Id.). Dr. Robbins noted that plaintiff had maintained her weight over the past three to four months. (Id.). Plaintiff's physical examination was unremarkable. (Id.). Dr. Robbins' assessment was estrogen deficiency and weight loss. (Id.). Dr. Robbins changed plaintiff's medications and recommended monthly follow-up. (Id.).

Plaintiff missed three scheduled appointments with Dr. Robbins in October. (Id.). Plaintiff contacted Dr. Robbins' office for medication refills in February 2001, March 2001, and April 2001, and August 2001. (Tr. 254-55).

Plaintiff presented to Dr. Robbins on November 21, 2001, with complaints of pain in her right arm, impaired vision in her right eye, and a knot over her right ear. (Tr. 254). Plaintiff's

physical examination was unremarkable. (Id.). Dr. Robbins' assessment was musculoskeletal dysfunction of the right arm, visual difficulty in the right eye, and estrogen deficiency. (Id.). Dr. Robbins prescribed Dexamethasone[11] and Depo Medrol[12] for the right arm pain and refilled her estrogen medication. (Id.).

Plaintiff presented to Mark Montag, M.D., an ophthalmologist, with complaints of decreased vision in her right eye on November 28, 2001. (Tr. 289-90). Upon examination, plaintiff's visual acuity was 20/20 in her left eye and 20/400 in her right eye. (Tr. 290). On November 29, 2001, plaintiff underwent a pneumatic retinopexy[13] on her right eye. (Tr. 287-88). On December 3, 2001, plaintiff reported aching in her temple area and some bubbles in her vision. (Tr. 292). Plaintiff's visual acuity was 20/50 in her right eye. (Tr. 286). On December 21, 2001, plaintiff reported that the bubble had gotten smaller. (Tr. 284). Plaintiff's visual acutiy in the right eye was 20/40+2. (Id.). Dr. Montag noted that plaintiff had significant subretinal fluid build-up. (Id.).

Plaintiff missed two scheduled appointments with Dr. Robbins in December 2001. (Tr. 253). On January 14, 2002, plaintiff presented to Dr. Robbins for a follow-up regarding the musculoskeletal dysfunction of the right arm. (Tr. 253). Plaintiff complained of a seven-pound weight gain and hot flashes. (Id.). Dr. Robbins noted that plaintiff had decreased range of motion

---

[11]Dexamethasone is indicated for the treatment of rheumatic disorders including arthritis, osteoarthritis, and bursitis. See PDR at 1979.

[12]Depo Medrol is indicated for the treatment of rheumatic disorders, including arthritis, osteoarthritis, and bursitis. See PDR at 2733.

[13]A procedure to repair a detached retina by holding it in place; e.g., by producing chorioretinal adhesions by freezing ("retinal cryopexy"). Stedman's at 1684.

of the right arm with pain. (Id.). Dr. Robbins' assessment was musculoskeletal dysfunction of the right arm. (Id.). Dr. Robbins discussed a weight loss program and prescribed estrogen, Dexamethasone, Depo Medrol, and Toradol.[14] (Id.).

Plaintiff presented to Dr. Montag on January 21, 2002, with complaints of blood in her right eye. (Tr. 280). Plaintiff indicated that the blood did not bother her and that it cleared-up in two or three days. (Id.). Dr. Montag's impression was retinal detachment in the right eye. (Id.).

Plaintiff underwent cryotherapy[15] on her right eye on March 8, 2002. (Tr. 274). On March 22, 2002, plaintiff reported pain in her right eye. (Id.). Dr. Montag noted that plaintiff's fluid build-up had flattened inferiorly. (Id.).

Plaintiff presented to Dr. Robbins on March 13, 2002, with complaints of elevated blood pressure following eye surgery. (Tr. 252). Upon examination, plaintiff's right eye was blood shot and her pupil was large, consistent with the recent eye surgery. (Id.). Dr. Robbins' assessment was elevated blood pressure. (Id.). He prescribed Diovan and recommended that plaintiff record her blood pressure twice a week. (Id.).

Plaintiff missed a scheduled appointment with Dr. Robbins on April 12, 2002. (Id.).

Plaintiff presented to Dr. Montag for a follow-up on June 10, 2002, at which time she reported no new symptoms. (Tr. 270). Plaintiff's visual acuity was 20/30-2 in her right eye and 20/20-1 in her left eye. (Id.). Dr. Montag noted that plaintiff's retinal detachment was stable. (Id.).

_____

[14]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level, usually in a post-operative setting. See PDR at 2944.

[15]The use of cold in the treatment of disease. Stedman's at 466.

- 14 -

Plaintiff presented to Dr. Robbins on June 18, 2002, with complaints of pain in her left knee, pain in her right arm, and elevated blood pressure. (Tr. 251). Dr. Robbins noted that the right shoulder and neck could be related to a prior accident, arthritis, cervical[16] disc disease, or fibromyalgia.[17] (Id.). Dr. Robbins' assessment was hypertension and musculoskeletal dysfunction of the right shoulder. (Id.). He refilled plaintiff's medications. (Id.).

Plaintiff presented to Dr. Robbins for a follow-up regarding her high blood pressure and shoulder pain on June 27, 2002. (Tr. 250). Dr. Robbins noted that plaintiff's shoulder had a much better range of motion. (Id.). Dr. Robbins' assessment was musculoskeletal dysfunction of the right shoulder. (Id.).

### Evidence Dated After the Expiration of Plaintiff's Insured Status

Plaintiff presented to Dr. Robbins on July 11, 2002, at which time Dr. Robbins noted that plaintiff's musculoskeletal dysfunction of the right shoulder was resolving. (Tr. 250).

Plaintiff missed an appointment with Dr. Robbins on August 26, 2002. (Tr. 249). On August 28, 2002, plaintiff complained of pain in her right shoulder when fixing her hair. (Id.). Dr. Robbins noted decreased range of motion in the right shoulder. (Id.). Dr. Robbins' assessment was musculoskeletal dysfunction of the right shoulder and hyperlipidemia.[18] (Id.). He stated that

---

[16]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[17]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. Stedman's at 725.

[18]Elevated levels of lipids in the blood plasma. Stedman's at 922.

he was concerned about a rotator cuff injury.  (Id.).  Dr. Robbins referred plaintiff to an

orthopedist, prescribed Darvocet,[19] and advised plaintiff to follow a low-fat diet.  (Id.).

Plaintiff presented to Patrick R. Knight, M.D., an orthopedist, on September 3, 2002, for

an evaluation regarding her right shoulder pain.  (Tr. 268).  Upon examination, plaintiff had fairly

good active and passive range of motion, good strength of her rotator cuff muscles, and was

neurologically intact.  (Id.).  X-rays revealed no evidence of bony abnormality.  (Id.).  Dr.

Knight's impression was right rotator cuff tendonitis[20]/bursitis.[21]  (Id.).  He recommended a home

therapy program and prescribed Naprosyn.[22]  (Id.).  Plaintiff missed a scheduled appointment with

Dr. Knight on October 15, 2002.  (Tr. 267).

The record reveals that plaintiff continued to see Dr. Robbins from September 2002

through August 2004 for treatment of hyperlipidemia, fatigue, obesity, and hypertension.  (Tr.

235-48).  On December 27, 2002, Dr. Robbins diagnosed plaintiff with B12 insufficiency, and

began administering monthly B12 injections.  (Tr. 247).  In January 2003, plaintiff reported

injuring her back after lifting a heavy object.  (Tr. 244).  In September 2003, Dr. Robbins

diagnosed plaintiff with possible lumbar disc disease.  (Tr. 243).  He recommended that plaintiff

apply for some type of welfare assistance, as she had no insurance.  (Id.).  On March 11, 2004,

Dr. Robbins diagnosed plaintiff with hypothyroidism.[23]  (Tr. 239).  On June 14, 2004, Dr. Robbins

---

[19]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 3504.

[20]Inflammation of a tendon.  Stedman's at 1944.

[21]Inflammation of a bursa.  Stedman's at 282.

[22]Naprosyn is indicated for the treatment of osteoarthritis.  See PDR at 2892.

[23]Diminished production of thyroid hormone, leading to clinical manifestations of thyroid
insufficiency, including low metabolic rate, tendency to gain weight, and somnolence.  See

noted that plaintiff was upset due to personal problems and prescribed Ativan.[24]  (Tr. 236).

The record reveals that plaintiff presented to Jared Flood, D.O. for various complaints, including back pain, knee pain, hypertension, hypothyroidism, obesity, heart flutters, anxiety, and depression, from 2004 through 2006.  (Tr. 119-44, 215-21).  On November 15, 2004, Dr .Flood diagnosed plaintiff with osteoarthritis with pain in the left knee.  (Tr. 221).  He prescribed Celebrex.  (Id.).  Plaintiff underwent x-rays in April 2005, which revealed minimal osteoarthritis of the sacroiliac joints, no significant osteoarthritis of the hips, and levoscoliosis[25] of the lumbar spine.  (Tr. 211).  An MRI of the hips was normal.  (Tr. 209).  X-rays of the lumbosacral spine revealed osteoarthritis with minimal joint space narrowing and spur formation at L1-2, L2-3, and L5-S1.  (Tr. 210).  An MRI of the lumbar spine revealed bulging discs at L1-2 and L2-3, disc dehydration, levoscoliosis, and changes of osteoarthritis.  (Tr. 207).  On March 18, 2005, Dr. Flood diagnosed plaintiff with peripheral vascular disease with bilateral lower extremity leg pain that is progressively worsening.  (Tr. 179).  Plaintiff underwent an arterial study on March 25, 2005, which revealed no evidence of peripheral vascular disease in either lower extremity.  (Tr. 212).  Plaintiff underwent x-rays of the right knee on October 11, 2005, which revealed moderate to severe osteoarthritis of the medial aspect of the right knee with joint space narrowing.  (Tr. 141).  On January 24, 2006, plaintiff reported that she had been involved in an automobile accident and had injured her chest, pelvis, left knee, and left hand.  (Tr. 130, 132-35).  Plaintiff underwent x-rays, which revealed osteoarthritis in her left hand and left knee.  (Tr. 132-33).  Dr.

---

Stedman's at 939.

[24]Ativan is indicated for the treatment of anxiety.  See PDR at 856.

[25]Curvature of the spine to the left.  See Stedman's at 1078, 1734.

Flood diagnosed plaintiff with depression on August 1, 2006. (Tr. 119).

Plaintiff presented to Lori A. Moyers, D.O. on May 16, 2006, for a physical examination at the request of the state agency. (Tr. 201-05). Plaintiff complained of arthritis, severe pain in the legs and hips, symptoms of peripheral vascular disease, high blood pressure, and slow thyroid. (Tr. 201). Upon examination, plaintiff's visual acuity with glasses was 20/25 in the right eye and 20/20 in the left eye. (Tr. 202). Plaintiff was able to ambulate and ascend the examination table without difficulty. (Tr. 203). Plaintiff had full range of motion in her shoulders and full upper extremity strength. (Id.). She had some decreased flexion, extension, and adduction in her left hip. (Id.). Plaintiff's lumbar spine was limited to 70 degrees lateral flexion. (Id.). Plaintiff had full lower extremity strength on the right and 4 out of 5 on the left. (Id.). Plaintiff's examination was suggestive of osteoarthritis of the bilateral lower extremities, with no evidence of lumbar radiculopathy, and no evidence of muscle atrophy or sensory loss. (Id.). Dr. Moyers' impression was osteoarthritis of the bilateral knees; hypertension; and hypothyroidism. (Id.). Dr. Moyers expressed the opinion that plaintiff was able to sit an unlimited amount; stand four hours a day; walk four hours a day; lift or carry ten pounds four hours a day; and handle objects, hear, speak and travel with no limitations. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Social Security Act on September 30, 2001. The claimant's date last insured was June 30, 2002.

2.  The claimant has not engaged in substantial gainful activity since at least September 30, 2001.

3.  The claimant has osteoarthritis, a history of bursitis/tendonitis in the right shoulder,

- 18 -

obesity, hypertension, hypothyroidism, a history of hyperlipidemia, a history of a right vision impairment, and recent diagnoses of anxiety and depression.

4.      The claimant did not have a severe impairment, or severe combination of impairments, imposing significant limitations of function, for twelve consecutive months in duration, despite treatment and existing prior to the expiration of her date last insured of June 30, 2002.  The claimant was not disabled prior to the expiration of her date last insured.  (20 CFR 404.1520(a)(4)(ii)).

5.      The claimant is not entitled to a Period of Disability and Disability Insurance Benefits.

(Tr. 16-17).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application filed on March 22, 2005, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(i) and 223 of the Social Security Act.

(Tr. 17).

## Discussion
## A.      Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (i) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claim

Plaintiff argues that the ALJ erred in determining that plaintiff did not suffer from a medically severe impairment prior to the expiration of her insured status on June 30, 2002.

Defendant contends that the ALJ properly found that plaintiff's impairments were not severe during the relevant period.

In order to be entitled to a Period of Disability and Disability Insurance Benefits, a claimant must be insured for disability. See 20 C.F.R. §§ 404.315, 404.320. Thus, in order to receive disability insurance benefits, a claimant must show onset of disability before the expiration of insured status. See Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998). In this case, plaintiff must show an onset of disability prior to June 30, 2002, plaintiff's last date of insured status.

The ALJ found at step two of the sequential evaluation that plaintiff had osteoarthritis, a history of bursitis/tendonitis in the right shoulder, obesity, hypertension, hypothyroidism, a history of hyperlipidemia, a history of right vison impairment, and a recent diagnosis of anxiety and depression. (Tr. 11-12). The ALJ determined, however, that plaintiff did not have a severe impairment beginning prior to the time her insured status expired. (Tr. 12). Step two of the sequential evaluation process requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. While the burden is not great, the claimant bears the burden at step two to demonstrate a severe impairment that significantly limits the ability to perform basic work activities. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). Severity is not a "toothless standard," and the Eighth Circuit has upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing. Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007). See, e.g. Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); Simmons v. Massanari, 264 F.3d 751,

755 (8th Cir. 2001); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997); Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996). The sequential evaluation process may be terminated at step two when the claimant's impairment or combination thereof would have no more than a minimal effect on the claimant's ability to work. See Nguyen, 75 F.3d at 431; Simmons, 264 F.3d at 755.

Plaintiff contends that the ALJ applied the wrong legal standard at step two of the sequential evaluation. Specifically, plaintiff states that the ALJ found that the record did not support the presence of a severe impairment imposing "significant limitations of function," instead of the "no more than minimal effect" standard. (Tr. 12). Plaintiff argues that this error was not harmless because the medical evidence reveals that plaintiff's impairments have more than a minimal effect on plaintiff's ability to work.

The ALJ found that plaintiff's impairments were not severe because they did not impose "significant limitations of function." (Tr. 12). In the context of judicial review of the denial of Social Security benefits, an error is harmless when the ALJ "would have reached the same decision denying benefits" even if the error had not occurred. See Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003). In Johnston v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000), the Eighth Circuit held that the ALJ's use of the "no significant limitation" standard instead of the "no more than a minimal effect" standard was harmless when the district court used the correct "no more than a minimal effect" standard.

The undersigned finds that although the ALJ applied the incorrect "no significant limitation" standard, this error was harmless, as the record reveals that plaintiff's impairments had no more than a minimal effect on her ability to work prior to the expiration of her insured status.

First, plaintiff's anxiety and depression were not diagnosed until after plaintiff's date last insured. Dr. Robbins indicated that plaintiff had personal problems and prescribed anti-anxiety medication in June 2004 and Dr. Flood diagnosed plaintiff with depression in August 2006. (Tr. 236, 119). There is no indication in the record that plaintiff experienced symptoms from any mental impairments prior to the expiration of her insured status. Thus, the ALJ properly found that these impairments were not severe during the relevant period.

With regard to plaintiff's vision loss, the ALJ properly found that this was not a severe impairment because it did not meet the twelve month durational requirement. (Tr. 14). As stated above, a claimant must demonstrate that her medically determinable impairment lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The record reveals that plaintiff sustained vision loss in her right eye in November 2001. (Tr. 254). Plaintiff underwent a pneumatic retinopexy on her right eye on November 29, 2001. (Tr. 287-88). Plaintiff also underwent cryotherapy on her right eye on March 8, 2002. (Tr. 274). On June 10, 2002, less than a year later, plaintiff's visual acuity was 20/30-2 in the right eye and 20/20-1 in her left eye. (Tr. 270). There is no indication in the record that plaintiff received any further treatment for her vision. Thus, the ALJ properly found that plaintiff's vision loss was not severe because it lasted less than twelve months.

The record indicates that plaintiff received treatment for obesity, hypertension, and hyperlipidemia. Plaintiff's hypertension was treated with medication and plaintiff's obesity and hyperlipidemia were treated with diet and exercise. (Tr. 235-63). As the ALJ noted, however, there is no evidence that these impairments resulted in any functional limitations prior to the expiration of plaintiff's insured status. As such, the ALJ properly concluded that these

impairments were not severe during the relevant period.

With regard to plaintiff's osteoarthritis, the record reveals that Dr. Robbins diagnosed plaintiff with possible degenerative osteoarthritis in January 2000. (Tr. 261). Dr. Robbins also noted a diagnosis of degenerative osteoarthritis in February 2000. (Id.). The next diagnosis of osteoarthritis, however, was not until November 2004. (Tr. 221). The record reveals no complaints or treatment for osteoarthritis during the relevant period of September 2001 through June 2002. Further, as the ALJ noted, objective testing performed after the expiration of plaintiff's insured status revealed only minimal disc disease, minimal osteoarthritis, and minimal joint space narrowing. (Tr. 15, 210-11). Thus, the ALJ properly found that plaintiff's osteoarthritis was not severe during the relevant period.

Finally, the record reveals that plaintiff sought treatment for right arm pain beginning in November 21, 2001. (Tr. 254). Plaintiff's physical examination at that time was unremarkable. (Id.). Dr. Robbins' assessment was musculoskeletal dysfunction of the right arm. (Id.). Plaintiff missed two scheduled appointments with Dr. Robbins in December 2001. (Tr. 253). In January 2002, Dr. Robbins again diagnosed plaintiff with musculoskeletal dysfunction of the right arm. (Tr. 253). Plaintiff next complained of right arm pain on June 18, 2002, at which time Dr. Robbins noted that plaintiff's right arm impairment was possibly related to a prior accident, possibly arthritis, cervical disc disease, or fibromyalgia. (Tr. 251). On June 27, 2002, Dr. Robbins noted that plaintiff had a much better range of motion of the shoulder, and again diagnosed plaintiff with musculoskeletal dysfunction of the right shoulder. (Tr. 250). Plaintiff saw orthopedist Patrick Knight in September 2002, after her date last insured, at which time she was diagnosed with right rotator cuff tendonitis/bursitis. (Tr. 268). Upon examination, plaintiff

had good strength in her rotator cuff muscles and an x-ray revealed no evidence of bony abnormality. (Id.). Plaintiff did not attend her follow-up appointment with Dr. Knight and sought no further treatment for her right arm. Thus, the ALJ properly found that plaintiff's right arm impairment was not severe during the relevant time.

In sum, although plaintiff was diagnosed was several impairments, none of these impairments had more than a minimal effect on plaintiff's ability to do basic work activities for at least twelve months prior to June 30, 2002. Significantly, none of plaintiff's treating physicians imposed any restrictions on plaintiff during the relevant period. The record reveals that plaintiff sought infrequent treatment for her osteoarthritis and right arm pain prior to the expiration of her insured status. Plaintiff's obesity, hypertension, and hyperlipidemia were treated conservatively and did not result in any work-related limitations. Although the ALJ applied the "no significant limitation" standard, this was harmless error, as the record reveals that plaintiff's impairments had no more than a minimal effect on plaintiff's ability to perform basic work activities.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a severe impairment prior to June 30, 2002. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this memorandum.

Dated this ___10th___ day of September, 2008.

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE